U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUN 2 8 2005

ROBERT H. SHEMWELL CLERK
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| FRANK'S CASING CREW & RENTAL TOOLS, INC. | CIVIL ACTION NO. 05-0261 |
| | MAGISTRATE JUDGE METHVIN |
| VS. | BY CONSENT OF THE PARTIES |
| DAVID L. SIPOS VERMILION RIVER TOOL & EQUIPMENT CO. | |

## MEMORANDUM RULING ON MOTION FOR SUMMARY JUDGMENT

This trademark and trade secret case has been referred to the undersigned magistrate judge to conduct all proceedings pursuant to consent of the parties under 28 U.S.C. §636(c).

On May 5, 2005, the undersigned magistrate judge conducted oral argument on the motion to dismiss filed by defendants David L. Sipos and Vermilion River Tool & Equipment Company ("defendants") on February 22, 2005.[1] The motion is opposed by plaintiff Frank's Casing Crew and Rental Tools, Inc. ("Frank's"),[2] and defendants filed a reply brief.[3] Additionally, the parties filed post-argument briefs.[4] Participating in oral argument were the following:

| NAME OF PARTY | ATTORNEYS |
|---|---|
| Plaintiff, Frank's Casing Crew & Rental Tools, Inc. | Guy Matthews |
| Defendants, Davis L. Sipos & Vermilion River Tool & Equipment Co., Inc. | Tiffany Thornton |

---

[1] Rec. Doc. 13.

[2] Rec. Doc. 29. Frank's's responsive pleading is entitled "Motion for Clarification of Orders."

[3] Rec. Doc. 34.

[4] On May 9, 2005, Frank's filed a motion for consent to submit supplemental authorities, (Rec. Doc. 36), which was granted, and on May 17, 2005, defendants filed a reply to Frank's's submission. (Rec. Doc. 37). Frank's second motion for consent to file supplemental authorities, (Rec. Doc. 40), was opposed by defendants and granted by the court on June 6, 2005.

### *Factual and Procedural Background*

This lawsuit was filed by Frank's in the form of a motion for preliminary injunction on February 9, 2005, alleging violations of the Lanham Act, 15 U.S.C. §1111, *et seq*, as well as state law claims of unfair competition, breach of fiduciary duty and confidential relationship, unjust enrichment, breach of contract, misappropriation of trade secrets, and unfair trade practices. Specifically, Frank's alleges that defendant David L. Sipos, a former employee of Frank's, started a competing business entity, Vermilion River Tool & Equipment Company, and is currently using the confidential and proprietary information he acquired at Frank's to design flush-mounted rotary spiders similar to spiders manufactured by Frank's.

In their motion to dismiss, defendants challenge this court's subject matter jurisdiction, alleging that Frank's has failed to state a claim under the Lanham Act, 15 U.S.C. §1111, *et seq*, which is the sole basis of federal jurisdiction.

### *Law and Discussion*

### I.   **Conversion of Defendants' Motion to Dismiss to Motion for Summary Judgment**

Rule 12 of the Federal Rules of Civil Procedure provides the following:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P 12(b).

In the instant case, defendants have attached Sipos's affidavit to their motion to dismiss. In his affidavit, Sipos discusses the design features of the rotary spider that Frank's alleges violates its trade dress, and for each listed feature, Sipos discusses how the feature is functional.

Prior to oral argument, the court determined that disposition of the motion to dismiss cannot be made without reference to Sipos's affidavit.[5] Accordingly, the court notified the parties that defendants' motion to dismiss was being converted to a motion for summary judgment.

## II. Burden of Proof on Motion for Summary Judgment

Summary judgment is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The threshold inquiry is whether there are any genuine factual issues which require resolution by a finder of fact because they may reasonably be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Substantive law dictates which facts are material. Id. The evidence must be reviewed in the light most favorable to nonmover. Id. On a motion for summary judgment, the movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmovant to show the existence of a genuine fact issue for trial; however, the nonmovant may not rest upon allegations in the pleadings to make such a showing. All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. Lincoln General Ins. Co. v. Reyna, 2005 WL 388614, *1 (5th Cir. 2005).[6]

---

[5] See Rec. Doc. 30, Minutes of Telephone Status Conference and Orders.

[6] The court notes that, had the motion to dismiss not been converted to a motion for summary judgment, the summary judgment standard would still apply. Pursuant to well-established caselaw, where a defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court (assuming that the plaintiff's federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case. Williamson v. Tucker, 645 F.2d 404, 415 (5th Cir. 1981). This rule was recently affirmed by the Fifth Circuit in Worldwide Parking, Inc. v. New Orleans City, 2005 WL 375945, *2 (5th Cir. 2005) (citing Williamson, court held that "where 'the challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action' – in other words, where factual issues determinative of jurisdiction are intertwined with or identical to factual issues determinative of the merits, the court should analyze the motion under the summary judgment standard).

Frank's alleges that defendants, as movants, have the burden of proof to prove that its trade dress is functional, and, therefore, not violative of the Lanham Act. However, defendants argue that, under the Supreme Court's decision in <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 121 S.Ct. 1255 (2001), t he burden of proof lies with Frank's, to wit:

> Title 15 U.S.C. § 1125(a)(3) (1994 ed., Supp. V) provides: "In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, *the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.*" This burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional. . . . *one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.*

<u>TrafFix</u>, 532 U.S. at 29-30, 121 S.Ct. at 1259-60 (emphasis added), citing <u>Qualitex Co. v. Jacobson Products Co.</u>, 514 U.S. 159, 164-65, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 775, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

At oral argument, the undersigned ruled that, despite the fact that Frank's has the ultimate burden of proof at trial on its Lanham Act claim, the burden of proof on the motion for summary judgment is properly on the defendants. Therefore, for purposes of the instant motion, defendants have the burden to prove that Frank's does not satisfy the three elements of a Lanham Act cause of action, and chiefly, that the design features of the Sipos spider are functional.

### III.   **The Lanham Act**

The allegedly infringing device in this case is a flush-mounted rotary spider. "A spider is a device used to aid in the handling of pipe strings during drilling, casing and tubing installation, and completion operations." (Complaint, p. 6, ¶14). In an affidavit attached to its response to defendant's motion to dismiss, Frank's identifies two of its spiders that are allegedly infringed by

spiders designed and manufactured by defendants: a 37 ½ inch[7] spider rated for approximately

400 tons and a 49 ½ inch spider rated for approximately 1,000 tons. Frank's claims that

defendants have manufactured a 37 ½ inch spider and a 49 ½ inch spider that are identical to its

spiders.[8] For purposes of clarity, this ruling will refer to these two spiders interchangeably as

"the spiders" or "the Frank's spiders."

Defendants contend that Frank's fails to articulate a Lanham Act claim, because the

Frank's spiders are entirely functional products that are not entitled to trade dress protection.

The Lanham Act protects trademarks, service marks, and trade dress. The United States

Supreme Court described the purpose of trademark law as follows:

> [T]rademark law, by preventing others from copying a source-identifying mark,
> "reduce[s] the customer's cost's of shopping and making purchasing decisions,"
> for it quickly and easily assures a potential customer that this item -- the item with
> this mark -- is made by the same producer as other similarly marked items that he
> or she liked (or disliked) in the past. At the same time, the law helps assure a
> producer that it (and not an imitating competitor) will reap the financial,
> reputation-related rewards associated with a desirable product. The law thereby
> "encourage[s] the production of quality products," and simultaneously discourages
> those who hope to sell inferior products by capitalizing on a consumer's inability
> quickly to evaluate the quality of an item offered for sale.

Qualitex, 514 U.S. at 163-64.

Frank's does not allege that defendants' rotary spider bears a distinctive "mark" *per se*

which would invoke trademark protection. Rather, Frank's alleges a claim of "trade dress"

infringement under the Lanham Act.

---

[7] This measurement apparently refers to the diameter of the spider.

[8] See Affidavit of Jeremy Angelle, ¶¶18-20.

"Trade dress" refers to "the total image and overall appearance of a product" and "may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." Sunbeam Prods., Inc. v. West Bend Co., 123 F.3d 246, 251 & n.3 (5th Cir.1997), cert. denied, 523 U.S. 1118 (1998) (citations omitted). "With trade dress, the question is whether the 'combination of features creates a distinctive visual impression, identifying the source of the product.'" Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 536 (5th Cir.1998), citing Sunbeam, 123 F.3d at 251 n. 3.

In recent years, "trade dress" protection has been expanded to include not only the packaging or image of a product, but its design as well. The Supreme Court has held, however, that product design, like color, cannot be inherently distinctive under trademark law. Unless the design of a product has acquired a secondary meaning which identifies it with the source of the product, it is not protected under the Lanham Act. See Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 214, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).[9]

In extending the protections of trade dress to product design, courts must be careful not to run afoul of patent law:

---

[9] The Supreme Court summarized its Wal-Mart v. Samara ruling as follows:

For example, in Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), we considered whether product-design trade dress can ever be inherently distinctive. Wal-Mart produced "knockoffs" of children's clothes designed and manufactured by Samara Brothers, containing only "minor modifications" of the original designs. Id., at 208, 120 S.Ct. 1339. We concluded that the designs could not be protected under §43(a) without a showing that they had acquired "secondary meaning," id., at 214, 120 S.Ct. 1339, so that they " 'identify the source of the product rather than the product itself,' " id., at 211, 120 S.Ct. 1339 (quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 851, n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)).

Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 36 (2003).

Trade dress protection, however, is not intended to create patent-like rights in innovative aspects of product design. Trade dress protection, unlike patent law, does not foster innovation by preventing reverse engineering or copying of innovative product design features. *See* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 6:3 (4th ed. 2001) ("Unlike patent law, the purpose of trademark and trade dress law is to prevent customer confusion and protect the value of identifying symbols, not to encourage invention by providing a period of exclusive rights."). "Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." TrafFix [Devices, Inc. v. Marketing Displays, Inc.], 532 U.S. 23, 29 (2001). Therefore, trade dress protection extends only to incidental, arbitrary or ornamental product features which identify the source of the product. If a product feature is functional, it cannot be protected trade dress. Unless protected by patent or copyright, functional product features may be copied freely by competitors in the marketplace. Id. "Allowing competitors to copy will have salutary effects in many instances. 'Reverse engineering ... often leads to significant advances in technology.' ". Id. (*citing* Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 160, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989)).

Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH, 289 F.3d 351, 355 (5th Cir. 2002).

## IV.    Elements of Lanham Act Cause of Action

To prevail on a trade dress infringement claim under the Lanham Act, a plaintiff must prove three elements: (1) its trade dress is inherently distinctive or has acquired secondary meaning; (2) its trade dress is primarily nonfunctional; and (3) there is a likelihood that the defendant's trade dress will lead to customer confusion. Wal-Mart, 529 U.S. at 210-11; Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769, 112 S.Ct. 2753, 2758 (1992); AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1535 (11th Cir. 1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987).

If a trade dress is functional, it does not merit protection, even if it is inherently distinctive or has acquired secondary meaning. Sunbeam, 123 at 251-52, citing Two Pesos, 505 U.S. at 775. Additionally, the court does not reach the issue of likelihood of confusion if it determines that the product's trade dress has acquired no secondary meaning. Security Center,

Ltd. v. First Nat. Sec. Centers, 750 F.2d 1295, 1302 (5th Cir. 1985). Considering the foregoing, and because the parties have focused on the issue of whether the design of the rotary spider is functional, the court will first consider the issue of functionality.

### 1.   **Functionality**

The crux of this case hinges upon whether the specific design features of the Frank's spiders are functional. If they are functional, they are not protected trade dress, and Frank's fails to state a claim under the Lanham Act.

> Trade dress protection does not extend to product features which are functionally useful:
> A design is "functional" . . . if the design affords benefits in the manufacturing,
> marketing, or use of the goods or services with which the design is used, apart
> from any benefits attributable to the design's significance as an indication of
> source, that are important to effective competition by others and that are not
> practically available through the use of alternative designs.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION §17 (1995). Thus, a feature or features of trade dress are not protectable if they are "essential to the use or purpose of the [product]," or "affect [the product's] cost or quality." Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 850 n.10, 102 S.Ct. 2182, 2187 n.10, 72 L.Ed.2d 606 (1982).

Frank's argues that the following design features of its spiders are non-functional: (1) split bushing design; (2) unique profile for the 37 ½ inch spiders; (3) split timing ring; (4) bolted plates; and (5) slips with "T" or "I" beam rails to guide the slips radially.

In a 64-paragraph affidavit, Jeremy Angelle, a mechanical, design, and developmental engineer at Frank's who used to work under Sipos's supervision, attests that each of the aforementioned features of the Frank's spiders are non-functional, in that they are not essential to the use of purpose of the spider, are not the reason that the spider works, and have no discernible effect on the cost of the spider. Rather, Angelle states that these features are designs that Frank's

has chosen, and that Sipos could have chosen alternative designs. Frank's also attaches an affidavit from Steve Killingsworth, a mechanical engineer it has retained as an expert, who attests that a flush-mounted spider can be designed without split bushing, a split timing ring, distinctive profile, bolted plate design, and the T/I slip guide rail, and that all of these features are, therefore, non-functional. To support its argument, Frank's also includes in its affidavits color photographs of rotary spiders manufactured by other oilfield manufacturers, including BJ/Varco, Weatherford, Blohm-Voss, and National Oilwell/Varco, arguing that these spiders do not resemble Frank's spiders as closely as the Sipos spider.

Each of the design features listed above will be discussed in turn:

### a. Split bushing design

The split bushing design describes the shape of the body of the spider, which is made from two substantially "C"-shaped sections that are not rigidly or pivotally connected. Frank's contends that the split bushing design is not essential to the use or purpose of the spider, and that a spider can be manufactured as a single forging or casting without a split design. However, defendants argue that the split bushing design eliminates the necessity of having additional locking hinges, pins, or other mechanisms to hold the spider together, as the shape of the rotary table holds the spider together without these locking mechanisms. Defendants further claim that this design feature also reduces the cost of the spider, because the customer does not have to purchase additional machinery to keep the two halves of the body together. Additionally, defendants allege that the split bushing design allows the body of the spider to be lifted and removed without having to take the pipe string out of the rotary table.

Review of the affidavits shows that it is undisputed that the split bushing design affects the use of the spider itself. In his affidavit, although Angelle states that "[t]he split bushing design is used as a design choice," he further attests that the split bushing design "allows the [flush mounted spider] to be opened for ease of access therewithin."[10] With respect to cost, although Mr. Angelle avers that the split bushing design has no effect on the cost of the spider, Mr. Sipos states that "the irregular shape of the [spider's] body typically requires a substantial amount of milling and metalwork if the body is formed from forged or cast metals and such construction can be time consuming and expensive."[11]

Considering the foregoing, the undersigned concludes that the split bushing design is clearly functional, in that it affects now only how the spider works, but also the cost of the spider.

### b. Unique profile

Frank's argues that the profile – or overall appearance – of its 37 ½ inch spider is unique as compared to other rotary spiders on the market, except for the 37 ½ inch spider designed by Sipos, and that this unique profile is protected trade dress. To support this argument, Frank's presented color photographs of several rotary spiders manufactured by other oilfield tool companies that have a different appearance from the Frank's 27 ½ inch spider.

Defendants acknowledge that although the Frank's 37 ½ inch spider and the Sipos 37 ½ inch spider are similar in profile, the profile of the spider results from the combination of the functional design features. Specifically, defendants argue that the profile of this spider allows the customer to forgo having to purchase "adapter rings," which allow a spider without this profile to

---

[10] See Affidavit of Jeremy Angelle, ¶39.

[11] See Affidavit of David Sipos, ¶8(b).

fit within the different rotary tables that might be found on a rig. Defendants argue that not having to purchase such adapter rings reduces the cost of the spider.

The court notes that, during Frank's's presentation during oral argument, Mr. Matthews stated the following with respect to the profile of Frank's spider:

> Next is the distinctive profile. Again, there are many structures that are used to try to make spiders fit in different size rotaries. Everyone does something different. No one except Sipos does what we do. *Now, in other words, what I'm saying is Varco -- Varco uses a big adapter thing. Actually it cost them 11,000 bucks apiece and you use them to fit each different size rotary, but everybody does something a little different.*[12]

Thus, Frank's acknowledges that using a profile other than the one that Sipos uses on his 37 ½ inch spider would require a potential customer to purchase an adapter to ensure that the spider fits in the rotary table, thereby incurring substantial additional costs. This statement shows that the "unique" profile of the Frank's 37 ½ inch spider is indeed a functional design feature, in that it affects the functioning and use of the spider, as well as the cost to the customer. Consequently, the court concludes that the unique profile to the Frank's 37 ½ inch spider is a functional design feature.

### c.   Split timing ring

The split timing ring – or leveling beam – is also in two pieces, and defendants argue that if you have a split bushing design, you need a split timing ring. The timing ring is connected to the bowl through the hydraulic cylinders; the slips hang from the timing ring. The timing ring must contain the same design shape as the bowl, to serve the purpose of allowing removal of the bowl while the string is in place through the rotary table for simple maintenance. Defendants

---

[12] See Unofficial Transcript of Oral Argument on Motion to Dismiss, May 5, 2005, p.34 (emphasis added).

argue that unless the timing ring is split into two portions, it will destroy the function of the split bushing design. As with the other design features of the rotary spider, Frank's argues that the split timing ring is not functional, but simply a design choice.

In his affidavit, Angelle states that the timing rings on the Frank's spiders are "substantially "C" shaped like the split bushing and are connected together to form a complete ring via bolts, hooks, etc,"[13] thereby acknowledging that the timing ring must contain the same design shape as the bowl. Furthermore, at oral argument, counsel for defendants explained the necessity of the split timing rings as follows:

> The thing that occurred to me first was that if the timing ring is not split, doesn't that just destroy the whole functional purpose of having a split bushing design? It has to match, because, otherwise, you have to remove the entire pipe string to get the timing ring off and then take out the half of the spider bowl.[14]

Considering that the split timing ring works together with the split bushing design for ease of maintenance and reduced cost, the court concludes that the split timing ring is functional.

### d.  Bolted plate design

The bolted plate design distinguishes Frank's spiders from spiders that are forged, milled, or cast. The plates are stacked together and held together under tension with bolts. These plates form the body of the rotary spider. Frank's argues that the bolted plate design is purely a design choice and does not affect the use of function of the spider.

In his affidavit, Angelle states that the use of plates that are bolted together "is a design choice that distinguishes these tools from ones that are "forged (i.e., compressed into a desired

---

[13] See Affidavit of Jeremy Angelle, ¶42.

[14] Transcript of Oral Argument on Motion to Dismiss, p. 10.

shape via force,) milled (i.e., cut out of a single piece of metal), or cast (i.e., liquid metal injected

or poured into a mold)."[15] However, defendants contend that the bolted plate design is entirely

functional in that it is more easily accommodated to a drilling rig than spiders that are cast or

forged. Defendants further argue that the stacked plate design reduces the incidents of

"cracking" often associated with castings used for spider bowl assemblies and thereby reduces

the costs associated with casting repairs. In his affidavit Sipos states that "the use of the stacked

plates allow[s] the individual plates to be cut or burned to net shape rather than milled and thus

serves to reduce the expense and time associated with forming the spider bowl."[16]

Additionally, and importantly, defendants argue that the bolted plate spider that is

manufactured by Frank's is a *manually-operated, top-mounted spider*, while the bolted plate

spider manufactured by Sipos is a *power-operated, flush-mounted spider*. Thus, defendants

contend that, with respect to this design feature, the spiders manufactured by Frank's and the

defendants are substantially different.

Considering the foregoing, the undersigned concludes that the bolted plate design is

functional, in that it affects both the use of the spider and the cost to the customer.

### e.    "T" or "I" Beam Rails

The "T" or "I" rail system assists the slip to guide the slip radially outward as the slips are

raised and radially inward as the slips are lowered. Defendants argue that because Frank's uses

the rail system only in its elevators and not its spiders, there can be no trade dress protection for

Frank's spiders on the basis of the rail system. Furthermore, defendants argue that customer

---

[15] See Affidavit of Jeremy Angelle, ¶61.

[16] See Affidavit of David Sipos, ¶8(c).

cannot see the T rail system from the outside of the spider. Therefore, defendants argue that the "T" rail system cannot lead to customer confusion. Considering that Frank's does not use the "T" or "I" rail system on its spiders, the court concludes that it is not entitled to trade dress protection for this feature.

Thus, all of the listed design features affect how the spider works and combine to create a spider that is cost-efficient for potential customers. In light of the foregoing, the court concludes that the listed design features are functional.

## 2.    **Functionality and Overall Appearance**

Frank's argues that, even if the court determines that the separate features of its spiders are deemed functional, the overall appearance of the spiders may still be considered non-functional and entitled to trade dress protection. In post-argument briefs, Frank's cites several cases in support of its argument that protectable trade dress may be found based on the overall appearance of a product even when the product's components are functional. See, e.g., American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136 (3rd Cir. 1986) (a product may have trade dress protection even if some of its component parts are functional, provided that the overall arrangement of the features is nonfunctional); AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531 (11th Cir. 1987) (protectable trade dress may be found in an overall product appearance even when the product itself is functional or includes certain functional features); Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc., 280 F.3d 619, 644 (6th Cir. 2002) (even if certain design aspects of retail clothing catalog were separately functional, design aspects could constitute "more than the sum of the catalog's non-protectable parts"); Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 841-42 (9th Cir.1987) (functional elements such as a restaurant's

decor, layout and style of service that are separately unprotectable can be protected together as part of a trade dress); Publications International, Ltd. v. Landoll, Inc., 153 F.3d 337, 334 (3rd Cir. 1998) (while none of the functional features of a cookbook can be appropriated to serve as a trade dress, it doesn't follow that the ensemble cannot be).

The court stated in Publications International, Ltd.

*In the case of a consumer product, the elements might all be functional. If the product nevertheless presented a distinctive appearance, that appearance would be eligible for legal protection as trade dress unless it was the only way the product could look, consistent with its performing each of the product's functions optimally.* [citations omitted]. But obviously the fact that a competitor's product has the same functional features as the plaintiff's isn't going to make the latter distinctive; if it didn't have the same functional features, it might not be the same product.

153 F.3d at 334 (emphasis added).

Review of the cases cited by Frank's, however, shows that they are distinguishable from the facts of the instant case. Most of the cases cited by Frank's discuss the trade dress of products that feature prominent graphic designs, such as ice cream bars (AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531 (11th Cir. 1987)), greeting cards (Hartford House, Ltd. v. Hallmark Cards, Inc., 846 F.2d 1268 (10th Cir. 1988)), insulated beverage servers (Service Ideas, Inc. v. Traex Corp.)), plush toys (American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136 (3rd Cir. 1986)), checks (John H. Harland Company v. Clarke Checks, Inc., 711 F.2d 966 (11th Cir. 1983)), and cookbooks (Publications International, Ltd. v. Landoll, Inc., 164 F.3d 337 (7th Cir. 1998)). With respect to these products, the court notes that the trade dress sought to be protected was the graphic design of the product or its packaging, that is, the color, pattern, texture, and images seen on either the item, its packaging, or the display case holding the product. There is

no question that the graphic designs on the packaging of such products are subject to trade dress protection.

In the instant case, however, the products at issue are oilfield tools that contain no decorative features or other graphic designs. In fact, the only feature of the Frank's spiders that could be considered to be decorative is the color of the spiders themselves. Frank's spiders are green, but counsel for defendants stated at oral argument that Sipos does not intend to use green as the color of his spiders.[17] Thus, the color of the Frank's spiders and the Sipos spiders are not the same. Furthermore, unlike the products discussed in the cited cases, flush-mounted rotary spiders are manufactured on a custom-purchase basis for sophisticated oilfield customers. This distinction between the spiders at issue in this case and the mass consumer products discussed in the cases cited by Frank's is critical; flush-mounted rotary spiders are not mass-produced, inexpensive products that are stacked on shelves for perusal and purchase by inexperienced, casual consumers. The parties do not dispute that oilfield rotary spiders are expensive products that are typically custom-built for sophisticated oilfield experts who are buying a product that has been specifically engineered for a particular job on a particular rig, and which, therefore, require particular performance capabilities.

To the extent that the cited cases do not involve such sophisticated products, they are inapposite.

Furthermore, the court finds that the appearance of the Frank's spiders are *the only appearance that the spiders can have*, consistent with the optimal functioning of each of their individually-designed component parts. Thus, the fact that the Sipos spiders and the Frank's

---

[17] At present, the Sipos spiders are gray in color and have not yet been painted.

spiders are both cylindrical in shape is not serendipitous, as Frank's suggests. The shape of the spiders is related to the functionality of the spiders themselves, as the shape is dictated by the configuration of the component parts, all of which work together to form cost-efficient flush-mounted rotary spiders for the consumer.

Finally, the court finds that the 37 ½ inch and 49 ½ inch Sipos spiders are *not* identical to their Frank's counterparts, as Frank's argues. The biggest difference is that Frank's bolted plates spiders are not flush-mounted; rather, they are top-mounted. Furthermore, the Frank's bolted plates spiders are not power-operated, as the Sipos spiders are. Instead, they are manually operated. Furthermore, Sipos uses a unique locking pin with latch system on his spiders, and he uses fewer slips on his spiders. The slips are also much larger in size. Thus, the overall appearance of the Frank's spiders and the Sipos spiders is not identical to the Frank's spiders.

Considering the foregoing, the court concludes that the overall appearance of the Frank's spiders is functional and not entitled to trade dress protection.

### 3. Secondary Meaning

Although the court need not consider secondary meaning if it finds that the spider in question is an entirely functional product, for the sake of completeness of the record, the court addresses this factor briefly. To be entitled to trade dress protection, a product's trade dress must have acquired secondary meaning. "The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source." Fuddruckers, 826 F.2d at 843. The prime element of secondary meaning is "a mental association in buyers' minds between the alleged mark and a single source of the product." Sno-Wizard Mfg., Inc. v.

Eisemann Products Co., 791 F.2d 423, 427 (5th Cir. 1986), citing Sicilia Di R. Biebow & Co. v. Cox, 732 F.2d 417, 425 n.4 (5th Cir. 1984).

In the instant case, Frank's has presented no evidence that its spiders have acquired secondary meaning in the marketplace. As defendants point out in their briefs, the only trade dress that Frank's could possibly claim that might cause the purchasing public to associate a spider with Frank's is the color green. However, as defendants point out, Sipos does not intend to use the color green for his spiders. Therefore, there is no evidence in the record that the Frank's spiders have acquired secondary meaning.

### 4.    Likelihood of Confusion

Finally, for the purposes of completeness of the record, the court addresses the likelihood of confusion factor. Likelihood of confusion "'exists when customers viewing the mark would probably assume that the product or service it represents *is associated with the source* of a different product or service identified by a similar mark.'" Fuddruckers, 826 F.2d at 845. The Fifth Circuit has enumerated several factors to determine whether there is a likelihood of confusion between two products, including (1) similarity of products; (2) identity of retail outlets and purchasers; (3) identity of advertising media; (4) type (i.e., strength) of trademark or trade dress; (5) defendant's intent; (6) similarity of design; and (8) actual confusion. Sno-Wizard Mfg., Inc. v. Eisemann Products Co., 791 F.2d 423, 428 (5th Cir. 1986), citing Falcon Rice Mill, Inc. v. Community Rice Mill, Inc., 725 F.2d 336, 345 (5th Cir.1984). See also Louisiana World Exposition, Inc. v. Logue, 746 F.2d 1033, 1040 (5th Cir. 1984). Courts have also held that "[i]t is often appropriate to consider the degree of care exercised by purchasers: confusion is more likely, for example, if the products in question are 'impulse' items or are inexpensive." Sno-

<u>Wizard</u>, 791 F.2d at 428, citing <u>Falcon Rice</u>, 725 F.2d at 345 n. 9. Finally, courts need not consider all of these factors; indeed, some may not be applicable in a particular case.

The most compelling factor with respect to likelihood of confusion in this case is the identity of the purchaser. As has been discussed, the products at issue in the instant case are flush-mounted rotary spiders manufactured for use in the oilfield industry by sophisticated professionals who are intimately aware of the specific design features of the spiders that they purchase or lease. Here, the Frank's spiders and the Sipos spiders are undoubtedly similar. Although the parties did not put on evidence regarding their respective advertising media, they stated that spiders of this type are typically custom-purchased by sophisticated professionals who have a specific need for a spider of this type, to wit:

Q (the Court):    My question really reflects a statement you just made which is that the oil field industry doesn't invite ornamental arbitrary features. This other aspect that I'm interested in also has to do with the unique nature of the oil field industry, and that being the way in which customers go about actually purchasing these spiders. In what way can a customer be confused about whether or not they're buying a Frank's spider or someone else's spider?

A (counsel for defendants):    Judge, actually that's a great question. It's one that I've asked myself over and over and I've actually discussed with my client. Mr. Sipos and Verteco, through his company, has made spiders on order only meaning clients come to him. Oil field companies come to him and say, I need a tool that can do X, Y, and Z. Can you make one? And he says, sure, let me design one and see if it will meet the specifications. Every tool that he has designed -- all of these spiders starting with the 400-ton, then the 750-ton and then the 1,000-ton have been specially designed -- or I should say, more appropriately, special ordered by different customers through Mr. Sipos. This is not something that he -- and I cannot speak to Frank's and how they sell their tools. I don't know if they've got a stockpile of these sitting around ready for customers to view or not. Mr. Sipos does

> not. There is no way that a tool that he builds or designs,
> thus far certainly not, can be confused with a Frank's tool
> by the customers buying them because they are built on
> order. This is not a Sunbeam case where you can go to the
> grocery store or go to Target and pick out a blender and say
> do I want the Westbin blue or the Sunbeam white. That's
> not the case with this tool.[18]

In <u>Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.</u>, 50 F.3d 189 (3rd Cir. 1995), <u>cert. denied</u>, 516 U.S. 808, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995), the Third Circuit addressed the issue of customer confusion with respect to an oilfield product. The trade dress infringement action, brought under the Lanham Act and state laws of unfair competition, involved a dispute between two manufacturers of directional control valves used in the control panels of offshore drilling rigs. Following a bench trial, the district court found that the trade dress of Versa's valves had met the non-functionality and distinctiveness requirements of the Third Circuit's trade dress jurisprudence, and that there was a likelihood of confusion of the sources of Bifold's valve and Versa's valves. Accordingly, the court entered a permanent injunction against Bifold, precluding it from selling its valve anywhere in the United States. Bifold appealed. <u>Versa</u>, 50 F.3d at 193.

On appeal, in finding that the manner in which the valves in question were marketed and sold virtually "nullified" any likelihood of confusion, the Third Circuit stated the following:

> The Versa B-316 and Bifold DOMINO JUNIOR valves are not sold on a shelf or
> selected on sight. Buyers order the valves based on functional specifications as
> shown on schematic diagrams, manufacturer's catalogs or specification sheets and
> samples available at trade shows and sales presentations. Moreover, purchasers
> cannot buy Versa B-316 or Bifold Domino Junior valves by name only. B-316
> valves can be purchased only by specifying a multi-digit part number pursuant to
> Versa's comprehensive part numbering system. . . . *Finally, as the district court
> also found, '[t]he purchasers and users of Versa's B-316 valves are qualified,
> knowledgeable personnel who understand how the valves are to be installed and operated.'*

---

[18] Transcript of Oral Argument on Motion to Dismiss, pp. 16-17.

*The appearance of these valves simply plays no role in the ordering process, which instead requires the use of detailed technical specifications and lengthy, manufacturer-specific part numbers. Under these circumstances, we find it utterly inconceivable that one of--let alone an appreciable number of-- the professional buyers of these valves will be confused, by the appearance of the Domino Junior, as to the valves' manufacturers or the relationship between them.*

*The foregoing evidence must be viewed as virtually precluding any likelihood of confusion. These valves are not bought by children or casual consumers, nor are they purchased solely by name. There is no likelihood of confusion-- indeed, virtually no possibility that the appearance of the Bifold Domino Junior valve body will mislead purchasers into thinking that they are ordering a Domino Junior valve from Versa or a B-316 valve from Bifold, and the enormous safety concerns surrounding the applications where these valves are used increase the already great care used by purchasers of these valves. Typically, they are found in offshore oil drilling control applications, hazardous and demanding environments where loss of human life, major environmental damage (and consequent liability), and huge property loss may be at stake if a valve does not function properly in an emergency shutdown. Because of the dire consequences of using an improper valve, engineers who design the control panels would be expected to exercise a high degree of caution in selecting valves, and thus would be highly unlikely to mistake a Versa B-316 for a Bifold Domino Junior.*

Versa, 50 F.3d at 213-14 (emphasis added). Because the court concluded that there was no likelihood of customer confusion, the court reversed the decision of the district court and vacated the permanent injunction against Bifold. Versa, 50 F.3d at 216. See also Security Center, Ltd. v. First Nat. Sec. Centers, 750 F.2d 1295, 1302 (5th Cir. 1985) (in trademark infringement case, court noted that "[t]he nature of the business in question may dictate whether customers would be likely to be confused about the origin of a product," stating that confusion "is more likely if the products or services in question are 'impulse' items or are inexpensive").

Similarly, in the instant case, the purchasers of flush-mounted rotary spiders are sophisticated, knowledgeable oilfield personnel who understand how the spiders are to be installed and operated. The appearance of the spiders *simply plays no role in the ordering process*. Rather, these spiders are custom-purchased based on specific, detailed, technical

specifications dictated by the rig in question and the project to be performed. Thus, applying the

factors in Fuddrucker's,[19] and particularly the identity of purchasers factor, the court concludes

that there is simply no credible evidence in this case that customers are likely to be confused

about whether they are purchasing a Frank's spider or a Sipos spider.

### *Conslusion*

For the foregoing reasons, the court concludes that Frank's has failed to satisfy the

elements of a Lanham Act claim. Because the Lanham Act is the only basis of federal

jurisdiction, and because the court concludes that Frank's fails to state a claim under the Lanham

Act, this case will be dismissed for lack of subject matter jurisdiction.

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment, converted

from defendants' motion to dismiss (Rec. Doc. 13), is **GRANTED**, and this case is dismissed for

lack of subject matter jurisdiction.

Signed at Lafayette, Louisiana on June 2 8, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

COPY SENT
DATE 6-28-05
BY CB
TO MEM
via fax: matthews
Abell Jr.
Edwards
Thornton)

---

[19] The court notes that the similarity of products and similarity of design factors have been discussed elsewhere in the court's ruling.